IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BREAH BEDFORD and SIMONE JONES, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | No. 19 C 1 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| BRANDON DEWITT et al., | ) | |
| | ) | |
| *Defendants*. | ) | |

**MEMORANDUM OPINION & ORDER**

The 2018 Chicago Pride Parade—an event celebrating love and acceptance—went profoundly awry for Plaintiffs Breah Bedford and Simone Jones. Their night took a turn for the worse outside of Big City Tap, a Lakeview bar and liquor store owned and managed by Defendant Joseph Plewa. When an altercation erupted between Plewa and Bedford's and Jones's group of friends, nearby on-duty Chicago Police Department (CPD) officers stepped in. Bedford ended up in the hospital. Jones was arrested and treated at the emergency room for injuries. They were both eventually charged with and prosecuted for misdemeanor battery to Plewa. They were found not guilty of this offense.

Bedford and Jones now bring several tort claims against Plewa and Defendant 1000 Liquors, Inc., the entity operating as Big City Tap (together, the "BCT Defendants"). (Dkt. 63). They also bring claims under 42 U.S.C. § 1983 for constitutional-rights violations and Illinois state-law claims against Defendants Officer Brandon Dewitt, Officer Colin Patterson, Officer Hector Galvan, Captain Paul Kane, Commander Robert Rubio, and Sergeant John Conneely (together, the "Defendant Officers"). (*Id.*) Finally, they bring a *Monell* claim for municipal liability under 42 U.S.C. § 1983 and indemnification claims against the City of Chicago (the "City"). (*Id.*)

1

All defendants now move for summary judgment on some or all of the respective claims against them. (Dkt. 142; Dkt. 150; Dkt. 153). For the following reasons, the Motions are granted in part and denied in part.

## BACKGROUND

### A.     The Big City Tap Incident

On June 24, 2018, over one million people attended Chicago's annual Pride Parade. (Dkt. 166 ¶ 5). Because of the anticipated large crowds, the Chicago Police Department (CPD) maintained a heavy presence throughout the neighborhoods along the parade's route. (Dkt. 175 ¶ 6). Defendant 1000 Liquors—doing business as Big City Tap—is a bar and liquor store located near the intersection of Belmont Avenue and Sheffield Avenue, close to the route's center. (Dkt. 166 ¶ 4; Dkt. 175 ¶¶ 2, 4; Dkt. 197 ¶ 3). CPD and/or the neighborhood alderman typically meet with local business owners before the parade to discuss best practices for managing the large crowds. (Dkt. 175 ¶ 7). Defendant Joseph Plewa, Big City Tap's owner and manager, attended such a meeting with CPD before the 2018 Pride Parade. (Dkt. 166 ¶ 4; Dkt. 175 ¶ 7). Big City Tap also had its own general late-hour exterior safety plan in place, though it dated from 2008, and the parties dispute whether it was followed in 2018. (Dkt. 175 ¶ 12; Dkt. 144-7; Dkt. 144-1 at 169–70; Dkt. 197 ¶¶ 8–9).

On the day of the parade, Defendant Captain Paul Kane told local business owners that if they wanted to stay open, they had to control the sidewalks in front of their establishments and ensure they remained passable. (Dkt. 166 ¶ 9; Dkt. 175 ¶ 8). A few times throughout the day, police told Plewa to close his liquor store temporarily because of the crowds. (Dkt. 176-8 at 46–49; Dkt. 197 ¶ 14). Big City Tap's surveillance cameras filmed the sidewalk in front of the bar and liquor store. (Dkt. 175 ¶ 13; *see also* dkt. 151-4, Ex. D, citing Dkt. 157 [hereinafter "BCT Video"]).

Plaintiffs Breah Bedford and Simone Jones went to the Pride Parade with several friends, and at about 9:20 p.m., their group and others had gathered outside Big City Tap. (Dkt. 166 ¶¶ 5–6; Dkt. 195 ¶ 1; Dkt. 197 ¶ 1; Dkt. 199 ¶ 31; Dkt. 175 ¶ 16; *see also* BCT Video at 19:17–19:30). Plewa and two bouncers for Big City Tap—James Holmes and Gregory Chmiel—spoke with the group, including Bedford and Jones, and told them to move further down the sidewalk. (Dkt. 166 ¶ 10; BCT Video at 19:30–20:40). The group complied and moved away from the bar's entrance. (Dkt. 166 ¶ 11; BCT Video at 19:30–20:40). Less than a minute later, Plewa approached the group again, telling them to move further down. (Dkt. 166 ¶ 14; BCT Video at 21:00–22:38). This time, the group did not move. (Dkt. 166 ¶ 14). But here, Plaintiffs' version of events diverges from that of the Defendants.

According to Bedford and Jones, Plewa started using vulgarities and racial slurs, calling them "black bitches" and "hoes" and telling them to "go back to the South Side." (Dkt. 176-1 at 50–53; Dkt. 176-4 at 47–49; Dkt. 176-3 at 123:1–13). They also reported that Plewa said, "You n****** need to get the f*** away from my bar" and to "get the f*** off my sidewalk." (Dkt. 176-2 at 89:5–21; Dkt. 176-3 at 123:12–13). Plewa denies this. (Dkt. 144-1 at 78). Plewa walked away again, leaving the group for a few minutes. (BCT Video at 22:38–26:50). He then came back a third time, with two men (whose employment with Big City Tap is disputed). (Dkt. 166 ¶ 17; Dkt. 195 ¶ 8; Dkt. 197 ¶¶ 20–22; BCT Video at 26:50–27:00). Plaintiffs claim that Plewa continued using racial slurs and telling them to "get the f*** off my sidewalk," which Plewa also denies—he claims he was only gesturing and telling them to move further down the sidewalk. (Dkt. 166 ¶ 17; Dkt. 195 ¶ 8; Dkt. 197 ¶¶ 20–21; BCT Video at 27:00–28:30). Jones thought that Plewa was a bouncer and asked to speak with his supervisor because of his treatment, which made him angry; Plewa denies this, too. (Dkt. 195 ¶ 9; Dkt. 197 ¶ 23).

3

Someone in the group—the parties dispute whether it appeared to be Jones, and Jones denies doing so—threw liquid at Plewa. (Dkt. 175 ¶ 19; Dkt. 166 ¶¶ 18–19; Dkt. 195 ¶¶ 10–11; Dkt. 197 ¶¶ 24, 27; Dkt. 199 ¶ 37; BCT Video at 28:32–33). The situation unraveled quickly, and the parties tell very different stories of the ensuing altercation. Plewa says that Jones punched and spat on him, so he grabbed her and tried to move her into an alcove away from the crowd and restrain her until the police arrived. (Dkt. 175 ¶ 20). Jones denies spitting, punching, or throwing anything on Plewa. In her telling, Plewa punched her in the face twice and dragged her by her hair down the sidewalk and into the doorway, ripping out one of her braids in the process. (Dkt. 195 ¶¶ 10–11; Dkt. 197 ¶¶ 24, 27; Dkt. 199 ¶ 37). The video does not show the full interaction, and the view of Jones is partially obstructed as people move around in the chaos. (BCT Video at 28:32–54). But Plewa—assisted by another man also restraining Jones—appears to grip Jones by the hair and drag her along the ground and partially out of view into a doorway. (BCT Video at 28:32–54). Jones says she immediately felt pain and throbbing from her eye after Plewa punched her and claims her face started bleeding; Plewa denies this. (Dkt. 195 ¶ 12; Dkt. 197 ¶ 28). Jones also claims that Plewa then knelt on her neck while she screamed for help because she could not breathe, all of which Plewa denies. (Dkt. 195 ¶ 13; Dkt. 197 ¶ 29; Dkt. 199 ¶ 38).

Meanwhile, Jones's friends—including Bedford—encircled Plewa and his men as he held on to Jones. (*See* BCT Video at 28:32–54). The video shows Bedford swinging an object several times at Plewa and his men. (BCT Video at 28:43–29:32). Bedford claims that she was swinging a denim bra, and after it was grabbed away from her, she tried to hit Plewa but could not get past the others. (Dkt. 195 ¶ 16; Dkt. 197 ¶ 32; BCT Video at 28:43–29:32). Plaintiffs also reported that their friend Keira McElrath tried to get to Jones, but that Plewa punched her in the chest; Plewa

denies this. (Dkt. 195 ¶ 15; Dkt. 197 ¶ 31). Within a minute, multiple CPD officers arrived on the scene. (BCT Video at 29:48–30:00).

## B.     CPD Involvement

Defendant Officers Brandon Dewitt, Hector Galvan, and Colin Patterson were on duty detailed to the Pride Parade and arrived first on the scene, with Officer Dewitt in the lead. (Dkt. 166 ¶ 27; BCT Video at 29:48–29:53). Here, again, the parties' versions of the story diverge. Officer Dewitt says that he saw Bedford hitting Plewa several times with a chain and her fist, which Bedford denies. (Dkt. 151-11 at 101–05; Dkt. 166 ¶ 28; Dkt. 195 ¶¶ 19–20; Dkt. 197 ¶ 36; Dkt. 199 ¶¶ 41–42). At this point, several people block the view from the surveillance camera, so the interaction between Bedford, Plewa, and Officer Dewitt is difficult to see. (BCT Video at 29:48–29:53). But a bystander caught the moments leading up to the Defendant Officers' arrival and Officer Dewitt's initial engagement with Bedford on a cell phone video. (*See* 151-8, Ex. G, citing Dkt. 157 [hereinafter "Facebook Video"]).

The video shows Bedford trying to get closer to the doorway and swinging her fists at one of the men standing in front of Plewa. (Facebook Video at 00:10–00:27). Officer Dewitt, however, claims that no one was between Plewa and Bedford when he saw her punch Plewa up to seven times in the "upper body area." (Dkt. 195 ¶ 22; Dkt. 197 ¶ 35). Plewa, too, says Bedford struck him repeatedly, including just as Officer Dewitt arrived. (Dkt. 197 ¶ 42). Bedford maintains that Holmes stood between her and Plewa, and that Holmes did not see anyone strike Plewa. (Dkt. 195 ¶ 23).

Officer Dewitt approached Bedford from behind and grabbed her. (Facebook Video at 00:27–00:29). The parties characterize Officer Dewitt's use of force differently. Officer Dewitt says that he pulled Bedford away from Plewa by grabbing her left shoulder with the "intent to

separate the individuals and place enough distance between the individuals to where Ms. Bedford could not continue to strike Mr. Plewa." (Dkt. 151-11 at 119:10–21; *id.* at 122:18–20). He was surprised to see Bedford fall backward to the ground. (*Id.* at 124:1–10). Bedford, though, claims that Officer Dewitt came up behind her and said, "move the f*** out the way." (Dkt. 168-4 at 118:19–119:5; *id.* at 123:3–4). She says that he used his forearm against her neck "like a WWE choke slam," and that he slammed her to the ground, where she hit her head on a metal grate in the sidewalk and blacked out. (Dkt. 168-4 at 119:12–120:9; *id.* at 122:23–123:2). The Defendant Officers dispute this characterization, and they deny that Officer Dewitt told her to "move the f*** out of the way." (Dkt. 195 ¶¶ 25–27). Bedford also claims that Officer Dewitt kicked her in the leg immediately after she hit the ground. (Dkt. 168-4 at 126:22–127:11).

Bedford landed on the ground and almost immediately began shaking, appearing to have a seizure. (Dkt. 166 ¶ 35; Dkt. 195 ¶ 35; Dkt. 197 ¶ 45; *see also* Facebook Video at 00:30–00:38). An ambulance eventually arrived and took Bedford to Illinois Masonic hospital for evaluation and treatment. (Dkt. 166 ¶¶ 35, 42; Dkt. 175 ¶ 29). Officer Dewitt completed a Tactical Response Report of the use of force, which Comm. Rubio approved, finding that Officer Dewitt complied with CPD policies and directives. (Dkt. 168-32 at 1–3).

## C.    Arrest of Jones

A large crowd continued gathering, and more police arrived. (Dkt. 166 ¶ 36). Defendants Captain Paul Kane, Commander Robert Rubio, and Sergeant John Conneely—all supervisors— arrived after Officer Dewitt's use of force. (Dkt. 166 ¶ 36). Sgt. Conneely and Comm. Rubio spoke with Plewa about what happened. (Dkt. 195 ¶ 39; Dkt. 197 ¶ 49; Dkt. 168-21 at 51–54). Plewa pointed out Jones, and he told the officers that Jones had spit on him and struck him (though Jones denies doing so). (Dkt. 166 ¶ 39; Dkt. 151-6 at 186:11–17; Dkt. 151-13 at 76:5–77:7). Plewa also

told the officers that Bedford had struck him with a chain (though Bedford denies doing so). (Dkt. 166 ¶ 43; Dkt. 151-13 at 76:13–19). Sgt. Conneely and Comm. Rubio then handcuffed Jones and placed her under arrest and in the squad car within a few minutes of arriving on the scene. (Dkt. 166 ¶ 40; Dkt. 195 ¶¶ 40, 44; Dkt. 197 ¶¶ 50, 55). Jones was crying throughout the arrest, asking what was happening and saying she did not do anything. (Dkt. 195 ¶ 40; Dkt. 197 ¶ 50).

Jones claims that while she was being arrested, she was visibly injured and bleeding from her face, which the Defendant Officers deny. (Dkt. 166 ¶ 41; Dkt. 195 ¶ 41; Dkt. 197 ¶ 51). Several of Jones's friends tried to explain to the Defendant Officers what had happened. They named Plewa as the aggressor who had punched Jones in the face first, and they said that Officer Dewitt had violently slammed Bedford to the ground. (Dkt. 195 ¶¶ 49–52). Plaintiffs claim that the Defendant Officers ignored the witnesses, which the Defendant Officers deny. (Dkt. 195 ¶ 52).

Officers Dewitt, Galvan, and Patterson were assigned as the reporting officers for the incident. (Dkt. 166 ¶ 46). These officers and Cpt. Kane went with Plewa into Big City Tap to review the bar's security footage. (Dkt. 166 ¶ 47; Dkt. 175 ¶¶ 33–35; Dkt. 195 ¶ 59; Dkt. 197 ¶¶ 66, 68). They told Plewa how to get a misdemeanor warrant against Bedford if he wanted to pursue charges against her. (Dkt. 166 ¶ 47). Plaintiffs' friend DaAngela Shepherd also entered the bar to try to get Officer Dewitt's name and badge number and to explain what happened. (Dkt. 195 ¶ 59; Dkt. 197 ¶ 68). Plaintiffs claim that the officers ignored her, which the Defendants deny. (Dkt. 195 ¶ 59; Dkt. 197 ¶ 68). According to Plaintiffs, around 10 to 15 potential witnesses were still outside the bar when Cpt. Kane and Officers Dewitt, Galvan, and Patterson came out after reviewing the security footage, but they did not take any information from these witnesses. (Dkt. 195 ¶ 61; Dkt. 197 ¶ 70). Nor did Sgt. Conneely, who drove Plaintiffs' friend Keira McElrath to the hospital to be with Bedford, take any information from her. (Dkt. 195 ¶ 62). Officers Dewitt and Patterson

only interviewed Plewa and his security guards Holmes and Chmiel, and Officer Galvan does not recall speaking with anyone specifically about what had happened. (Dkt. 195 ¶ 64).

### D. Jones's and Bedford's Injuries

According to Jones, her face was bleeding when officers arrived and arrested her, but the Defendants deny this. (Dkt. 195 ¶¶ 12, 41; Dkt. 197 ¶¶ 28, 51). After her arrest, nondefendant CPD officers took Jones to the 19th District station. (Dkt. 166 ¶ 53). Officers Dewitt, Galvan, and Patterson met them there later that night, after stopping at Illinois Masonic to check on Bedford's status. (Dkt. 166 ¶¶ 50, 54; Dkt. 195 ¶ 63).

The parties dispute whether Jones requested medical treatment from Officers Dewitt, Galvan, and Patterson, or from any nondefendant officers, at the station. (Dkt. 166 ¶¶ 55–56; Dkt. 195 ¶ 72). They also dispute whether these Defendant Officers offered Jones medical attention at the station. (Dkt. 195 ¶¶ 73–74). The lockup keeper said that Jones needed medical clearance before being processed. (Dkt. 195 ¶ 75). So, at about 5:25 a.m.—approximately eight hours after the incident at Big City Tap and Jones's arrest—Officers Galvan, Dewitt, and Patterson took Jones to Thorek Hospital. (Dkt. 195 ¶ 77; Dkt. 166 ¶ 57).

Thorek's ER physician diagnosed Jones with an eye contusion (a black eye) and discharged her with ice and Tylenol. (Dkt. 166 ¶ 64). Her left eye was swollen shut, and she had scratches on her lips. (Dkt. 166 ¶ 61; Dkt. 197 ¶ 78; *see also* Dkt. 168-27). The parties dispute when her injuries became visible. (Dkt. 166 ¶¶ 59, Dkt. 175 ¶ 55; Dkt. 195 ¶ 80). The Defendant Officers say that her eye injury would have started out small and become larger over time. (Dkt. 166 ¶ 59). Jones's treating physician, however, testified that her swollen eye would have happened within minutes of the blunt trauma and become visible within half an hour. (Dkt. 195 ¶ 80; Dkt. 197 ¶ 78).

8

The following day, Jones went with her mother to the emergency room at South Suburban Hospital for continued pain in her left eye and neck soreness. (Dkt. 195 ¶ 81; Dkt. 197 ¶ 79). She was given Toradol for the pain and swelling; a CT scan of her orbital to ensure there were no facial fractures; a prescription for Naproxen; and prescription antibiotic eyedrops to prevent infection. (Dkt. 195 ¶ 81; Dkt. 197 ¶ 79). She suffered persistent pain in her left eye and a stiff, sore neck for weeks after the incident. (Dkt. 197 ¶ 80). She also describes emotional and psychological injuries, and she saw a therapist three times and a religious counselor once. (Dkt. 175 ¶ 57; Dkt. 197 ¶ 84).

Bedford's treating physicians diagnosed her with pseudo-seizure activity, also known as psychogenetic non-epileptic seizures ("PNES"), following this incident. (Dkt. 166 ¶ 68; Dkt. 195 ¶ 84). She had experienced this condition in the past, such as when she had anxiety or panic attacks, which had previously required treatment at the hospital. (Dkt. 166 ¶¶ 69–70; Dkt. 151-31 at 23–25).

### E.    Criminal Prosecution

Plewa voluntarily signed complaints against Bedford and Jones for battery. (Dkt. 166 ¶ 49; Dkt. 175 ¶¶ 36–37; Dkt. 151-19; Dkt. 151-20). Plewa filed his complaint against Jones on June 25, and he filed his complaint against Bedford on June 28. (Dkt. 151-19; Dkt. 151-20). CPD also prepared a report of the incident and listed Jones and Bedford as battery offenders. (Dkt. 175 ¶ 39; Dkt 168-15). The incident report—written by Officer Patterson and reviewed by Officer Dewitt—does not state that Bedford punched Plewa, but it does state that she struck multiple people with a plastic chain (which Bedford denies doing). (Dkt. 195 ¶ 24; Dkt. 197 ¶ 37; Dkt. 199 ¶ 43). Bedford and Jones were charged with misdemeanor battery through the complaints Plewa signed. (Dkt. 166 ¶ 71). The case went to a bench trial, and Plewa, Holmes, and Officer Dewitt testified, but Officers

Galvan and Patterson did not. (Dkt. 166 ¶¶ 76–77). The judge found Bedford and Jones not guilty of the misdemeanor battery charges. (Dkt. 166 ¶ 79; Dkt. 175 ¶ 48).

F.     **Chicago Police Department Policies and Practices**

In December 2015, then-Mayor Rahm Emanuel admitted to the existence of a "code of silence" that existed amongst CPD officers to ignore, deny, or cover up officer misconduct. (Dkt. 199 ¶ 1; Dkt. 170 ¶ 62). He created a Police Accountability Task Force (PATF) to review the City's system of accountability, oversight, and training for police officers and to make recommendations for improvements. (Dkt. 170 ¶ 63). In April 2016, the PATF released a report acknowledging an entrenched institutional code of silence and systematic failures to hold officers accountable for misconduct. (Dkt. 199 ¶ 3; Dkt. 170 ¶ 63).

In January 2017, the U.S. Department of Justice published a report after a year-long investigation that found a widespread code of silence endemic to the CPD. (Dkt. 199 ¶ 2; Dkt. 170 ¶ 65). Specifically, the DOJ report found that CPD had historically tolerated unconstitutional force, developed a pattern or practice of unconstitutional force, and failed to hold officers accountable for using force contrary to CPD policy. (Dkt. 199 ¶ 2). The DOJ report further concluded that "CPD's failure to meaningfully and routinely review or investigate officer use of force is a significant factor in perpetuating practices that result in a pattern of unlawful conduct." (Dkt. 199 ¶ 2). It identified patterns of investigative flaws that undermined the meaningfulness of those few investigations conducted. (Dkt. 199 ¶ 2). The DOJ report also acknowledged that during its investigation, CPD had made some reforms and improvements. (Dkt. 170 ¶¶ 65–68).

The State of Illinois filed a complaint in federal court in August 2017, seeking "to address allegations that CPD engages in a pattern and practice of civil rights violations and unconstitutional policing and address recommendations and conclusions set forth by the U.S. DOJ Report and the

PATF Report." (Dkt. 170 ¶ 70). The City entered into a federal consent decree in January 2019 to reform CPD practices. (Dkt. 154-19). Subsequent independent monitoring reports show that as of 2022, the CPD had not reached full compliance with all paragraphs in the consent decree's Accountability and Transparency section. (Dkt. 199 ¶¶ 28–30).

In 2016, CPD began updating its training on the use of force. (Dkt. 170 ¶ 15).[1] CPD updated its Use of Force policy in 2017. (Dkt. 170 ¶ 17; Dkt. 154-5). The Use of Force policy was enacted on October 16, 2017 and was in effect in June 2018. (Dkt. 170 ¶ 17). This policy pronounced an affirmative duty on officers to report fellow officers' noncompliance with law or CPD policy. (Dkt. 154-5 at 4). It also pronounced an affirmative duty to intervene if an officer witnesses noncompliance. (*Id.*) It declared that CPD members were responsible for truthfully and completely describing the circumstances of uses of force and for articulating the specific facts to explain the decision to use force. (*Id.*) Finally, the policy stated that excessive or unwarranted force would not be tolerated. (*Id.* at 2). CPD trained all officers on the 2016 Use of Force policy between July 2017 and September 2017. (Dkt. 170 ¶ 25). CPD also required yearly use-of-force training sessions for all officers. (Dkt. 170 ¶ 26). The updated polices and training reflect recommendations from outside investigations, including those made by the 2017 DOJ report. (Dkt. 170 ¶ 29).

The Chicago City Council established the Civilian Office of Police Accountability (COPA) in 2016, and COPA became operational in 2017. (Dkt. 170 ¶ 43). COPA investigates some

---

[1] Plaintiffs move to strike under Rule 37(c)(1) those facts in the City's Rule 56.1 Statement based on the affidavits and depositions of Lieutenant John Benigno and Lieutenant Robert Flores. (*See* Dkt. 170 ¶¶ 12–38, ¶¶ 40–51). They claim that the City did not properly disclose Benigno and Flores as experts pursuant to Rule 26(a)(2), citing *Mannoia v. Farrow*, 476 F.3d 453, 456–57 (7th Cir. 2007) (affirming district court's striking testimony of undisclosed police-procedures expert), and *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758–59 (7th Cir. 2004) (affirming exclusion of affidavit of undisclosed medical expert). The Court agrees with the City that Benigno's and Flores's testimony did not offer opinions as general police-procedures experts, as did the expert in *Mannoia*. They offered testimony about CPD training and CPD complaint and disciplinary procedures as employees and corporate representatives. They were properly disclosed to the Plaintiffs on June 1, 2021 and made available for Rule 30(b)(6) depositions, which Plaintiffs did not take. (Dkt. 200-1). The Court admits the affidavits and testimony of Benigno and Flores.

allegations of police misconduct, and the Bureau of Internal Affairs (BIA) investigates others. (Dkt. 170 ¶¶ 45–47). COPA investigated Officer Dewitt's use of force. (Dkt. 168-18).

CPD also has rules intended to prevent officers from providing false testimony and covering up misconduct. (Dkt. 170 ¶ 37). These rules—in force in 2018 and earlier—also create an obligation for all members of CPD to report misconduct and tell the truth. (Dkt. 170 ¶¶ 38–39). There are instances where CPD investigates and punishes officers who provide false testimony and cover up misconduct. (Dkt. 170 ¶¶ 40–41). The parties, however, dispute whether these efforts are genuine and taken in good faith.

All Defendant Officers involved in this incident except for Officer Dewitt testified that based on their experience, a code of silence does not exist within CPD. (Dkt. 199 ¶¶ 4, 10, 18, 23, 25). Cpt. Kane, Comm. Rubio, and Sgt. Conneely either denied being aware of the conclusions of external investigations and city officials' acknowledgements of a code of silence, or they disagreed with these conclusions. (Dkt. 199 ¶¶ 5–9, 15–17, 19–21).

## G. Procedural History

Bedford and Jones bring claims against several defendants, which break down into three groups: (1) Plewa and 1000 Liquors, Inc. (Big City Tap); (2) CPD Officers Dewitt, Galvan, and Patterson; and Sgt. Conneely, Comm. Rubio, and Cpt. Kane; and (3) the City of Chicago. Each group of defendants has moved for summary judgment on the respective claims against them.[2] (Dkt. 142; Dkt. 150; Dkt. 153).

---

[2] Defendants Plewa and 1000 Liquors (the "BCT Defendants") move for partial summary judgment. (Dkt. 142). They acknowledge they do not move for summary judgment on Jones's assault and battery claim. (*Id.*) Plaintiffs also bring claims of malicious prosecution against the BCT Defendants. (Dkt. 63 at ¶¶ 83, 84, 87; Dkt. 174 at 1 n.1). The BCT Defendants make no arguments for summary judgment on Plaintiffs' malicious-prosecution claim. (*See* dkt. 143).

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). This includes when, after adequate discovery, the non-moving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

The Court takes the facts in the light most favorable to the non-moving party. *Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021) (citing *Anderson*, 477 U.S. at 247). When a non-moving party specifically avers material facts that contradict those of the moving party, the Court must deny summary judgment. *Id.* at 996 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). The Court does not "weigh credibility, balance the relative weight of conflicting evidence, choose between competing inferences, or resolve swearing contests." *Flowers v. Renfro*, 46 F.4th 631, 636 (7th Cir. 2022) (citing *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

## DISCUSSION

### A.     Defendant Officers' Motion for Summary Judgment

#### i.  Constitutional Claims

Plaintiffs allege that the Defendant Officers violated their constitutional rights and are liable for damages under 42 U.S.C. § 1983. The officers raise qualified immunity as a defense. Qualified immunity shields state officials from Section 1983 liability "unless (1) they violated a

federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *Gupta*, 19 F.4th at 1000 (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Courts may determine whether a constitutional right was clearly established before determining whether a violation occurred. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

For official action to violate a clearly established constitutional right, the law at the time must be "sufficiently clear" that "every reasonable official would understand that what he is doing is unlawful." *Gupta*, 19 F.4th at 1000 (cleaned up). A "clearly established" right does not require a case precisely on point, but existing precedent must place the constitutional question beyond debate. *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7–8 (2021). Qualified immunity thus provides officers "breathing room to make reasonable but mistaken judgments about open legal questions." *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 713 (7th Cir. 2013) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

### a) Excessive Force

Bedford claims that Officer Dewitt violated her constitutional rights by using excessive force against her. (Dkt. 63 at 9 (Count I)). The Fourth Amendment—applied to state actors via the Fourteenth Amendment—prohibits police officers from using excessive force when seizing a person. *Graham v. Connor*, 490 U.S. 386, 394 (1989). "Whether an officer violated a suspect's rights depends on the reasonableness of the use of force." *Flowers*, 46 F.4th at 636. The reasonableness inquiry requires close attention to the facts of each case. *Id.* (citing *Rivas-Villegas*, 142 S. Ct. at 8). The Court considers "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he [or she] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 397. Because it is so fact-intensive, "the *Graham* reasonableness inquiry nearly always requires a jury to sift through

disputed factual contentions, and to draw inferences therefrom." *Gupta*, 19 F.4th at 996 (quoting *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005)).

Here, there are several disputed material facts about what was happening when Officer Dewitt arrived on the scene and whether his use of force was reasonable under the circumstances. The videos provide an incomplete picture. The Facebook video shows Bedford swinging her fist at least once at an individual when Officer Dewitt arrived. The parties agree that Bedford was not actively resisting arrest because she did not have time to react before Officer Dewitt applied force. But the parties dispute the level of threat that Bedford posed to Plewa's and Holmes's safety when Officer Dewitt arrived. Though Officer Dewitt says that he saw Bedford strike Plewa multiple times, Bedford maintains—and the video appears to show—that Holmes stood between her and Plewa. Officer Dewitt also says that he saw Bedford striking people with a chain, which Bedford denies. The parties likewise dispute the severity of the offense in question; Bedford calls it a simple battery with no injury, while Officer Dewitt claims he saw at least seven blows against Plewa. Though there was undisputedly a physical altercation underway when Officer Dewitt arrived, a jury must decide the degree of immediate threat that Bedford posed at the time and the objective severity of the offense.

Moreover, the amount of force that Officer Dewitt used against Bedford is hotly disputed. Viewing the facts in the light most favorable to Bedford, Officer Dewitt made no attempt to warn her to stop and back away from Holmes or Plewa before grabbing her immediately. Nor did he try to get between Bedford—a petite woman—and the other—much larger—men to deescalate the situation. Instead, according to Bedford, he yelled, "Get the f*** out of the way" as he hooked his forearm around her neck, grabbed her left shoulder, choke-slammed her to the ground, and kicked her after she fell. Though Officer Dewitt claims he did not intend to take Bedford to the ground,

15

an officer's subjective intentions are not relevant to the objective-reasonableness inquiry. *See Graham*, 490 U.S. at 397.

The two videos are not high quality and do not clearly show everything that happened as Officer Dewitt arrived on the scene. *See Johnson v. Rogers*, 944 F.3d 966, 969–70 (7th Cir. 2019) (noting that video quality may not be clear enough to discern what happened in an encounter, and when facts are disputed, summary judgment is improper); *Gupta*, 19 F.4th at 998 (describing video evidence that could support numerous reasonable conclusions because it lacked audio and angle does not show full encounter). A reasonable juror here could conclude that Officer Dewitt employed a forceful choke slam in response to a minor physical altercation, disproportionate to the circumstances, and then kicked Bedford after she was already on the ground. Unnecessary force that is not reasonably adapted to gain control of a suspect violates the Fourth Amendment. *See Johnson*, 944 F.3d at 970 (collecting cases); *cf. Payne*, 337 F.3d at 778 ("A police officer's use of force is unconstitutional if, 'judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest.'" (quoting *Lester v. City of Chicago*, 830 F.2d 706, 713 (7th Cir. 1987))).

Officer Dewitt relies on *Johnson v. Rogers* to support summary judgment in his favor. In *Johnson*, the Seventh Circuit affirmed an officer's qualified-immunity defense for his use of force. *Johnson*, 944 F.3d at 970. The Court assumed the plaintiff's version of the facts that the officer kicked the plaintiff in the shins as he was resisting arrest. *Id.* Because it was not disputed that the plaintiff-arrestee told officers that he wanted to run away and remained on his feet after the first attempt to unbalance him, the officer was entitled to use steps that were reasonably likely to regain control and sit him back down. *Id.* Under those circumstances, the Court said, taking a further step in using force was reasonably necessary. *Id.* But in *Johnson*, the arrestee had already been placed

in custody and was actively trying to escape. Whereas here, Bedford had no opportunity to comply with officers' directives. Furthermore, unlike in *Johnson*, the events leading up to the interaction between Bedford and Officer Dewitt are disputed. So is the amount of force that Officer Dewitt used to gain control of the situation.

Because there are disputed material facts as to the events preceding Officer Dewitt's use of force and the degree of force used, reasonableness cannot be determined as a matter of law. Likewise, such disputed facts preclude the Court from finding that Officer Dewitt is entitled to qualified immunity for any reasonable mistake he may have made in his use of force. *See Gupta*, 19 F.4th at 996 (holding disputed facts over the degree of force used precluded qualified immunity on summary judgment).

### b) False Arrest/Unlawful Detention

Jones brings a false-arrest and unlawful-detention claim against all six Defendant Officers. (Dkt. 63 at 9 (Count II)). A false-arrest claim requires Jones to show that the Defendant Officers arrested her without probable cause. *Abbott*, 705 F.3d at 713–14; *see also Braun v. Village of Palatine*, 56 F.4th 542, 548 (7th Cir. 2022) (plaintiff must show absence of probable cause to succeed in § 1983 false-arrest claim). "Probable cause to justify an arrest exists if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott*, 705 F.3d at 714. "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1982).

The probable-cause determination is a "purely objective inquiry; the officer's subjective state of mind and beliefs are irrelevant." *Abbott*, 705 F.3d at 714. The court focuses on the officer's

knowledge at the time of the arrest and whether those facts and circumstances amount to probable cause when viewed from an objectively reasonable officer's perspective. *Id.* An officer may base his probable-cause determination on a putative victim's statements if he reasonably believes that person is telling the truth. *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009). But an officer's belief need not be correct, nor even more likely true than false, only reasonable. *Braun*, 56 F.4th at 549. "An officer should pursue reasonable avenues of investigation and may not close his eyes to facts that would clarify the situation, but once an officer has established probable cause, he may end his investigation." *McBride*, 576 F.3d at 707 (collecting cases); *see also Young v. City of Chicago*, 987 F.3d 641, 645 (7th Cir. 2021). Finally, an officer "may not ignore conclusively established evidence of the existence of an affirmative defense," but there is no Fourth Amendment duty for an officer to investigate whether a valid defense exists. *McBride*, 576 F.3d at 707 (quoting *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1061 (7th Cir. 2004)).

Qualified immunity provides an "added layer of protection by shielding officers from suit for damages if a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed." *Abbott*, 705 F.3d at 714 (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)) (internal quotations omitted). "[A]rguable probable cause" protects officers who "reasonably but mistakenly believe that probable cause exists." *Id.* at 714–15. An "arrest not supported by arguable probable cause is a violation of a 'clearly established' constitutional right." *Id.* at 715.

Probable cause depends on the elements of the underlying criminal offense, as defined by state law. *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979); *Abbott*, 705 F.3d at 715. Under Illinois law, an individual commits a battery "if he or she knowingly without legal justification by any

18

means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 Ill. Comp. Stat. 5/12-3(a).

Here, Plewa says he told Sgt. Conneely and Comm. Rubio that Jones had spat on and struck him. Jones denies doing so and maintains that Plewa was the original aggressor. Although Sgt. Conneely and Comm. Rubio do not remember precisely what Plewa told them, it is undisputed that he talked to them and pointed Jones out to them shortly before she was handcuffed. Then, Officers Dewitt, Patterson, and Galvan and Cpt. Kane entered Big City Tap and watched the surveillance footage. They also spoke with bouncers Chmiel and Holmes. They did not take witness statements from anyone associated with Jones and Bedford, either before or after arresting Jones.

There is no doubt that the Defendant Officers relied primarily on one side's version of events in making their probable-cause determination. Jones claims that the officers had a duty to conduct a "thorough and complete investigation" before arresting or detaining her, and that they failed to do so. But the Fourth Amendment does not require officers to get to the bottom of exactly what happened in a chaotic situation before making an arrest. *See Spiegel v. Cortese*, 196 F.3d 717, 724–25 (7th Cir. 1999) ("The law does not require that a police officer conduct an incredibly detailed investigation at the probable cause stage."). Nor must they determine whether an arrestee has a valid affirmative defense for the alleged offense. *See McBride*, 576 F.3d at 707. Rather, they must take reasonable steps to investigate, and once they establish probable cause, nothing more is required. *See id.*

The Officers encountered Plewa restraining Jones, and they credited his statements that she had spit on and struck him in an earlier altercation. This conduct, if true, would constitute a battery under the statute's second definition. *See People v. Davidson*, 2023 IL 127538 ¶ 25 (holding that

19

a reasonable person would need to feel insulted or provoked by physical contact for such contact to be a battery); *People v. Peck*, 633 N.E.2d 222, 223–24 (Ill. App. Ct. 1994) (spitting can be insulting or provoking to a reasonable person and can constitute a battery). The issue then becomes whether the Defendant Officers reasonably believed, under all the circumstances, that Jones committed a battery against Plewa.

Jones makes two primary arguments that the Defendant Officers could not have reasonably believed Plewa's story. First, the size difference between Plewa—a 6'3" 280-pound man—and Jones—a 5'1" 98-pound woman—makes his claim that he was the victim of a battery inherently suspicious. Second, the other witnesses on the scene all told a different story of who was the first aggressor. Both arguments fall short.

Jones cites no law to support her contention that the size difference between her and Plewa is relevant to the officers' reasonable belief that she made an intentional, objectively insulting or provoking physical contact with Plewa. Even if a person's relative size and strength makes it less likely that they physically harmed the other, this is irrelevant. The insulting or provoking contact itself is the injury under Section 5/12-3(a)(2). *See Davidson*, 2023 IL 127538, ¶ 25. Regardless of how much larger and stronger Plewa was compared with Jones, nothing about her size renders her incapable of committing a battery against him. She claims that her face was bleeding and visibly swollen—facts that the defendants dispute—as another reason for officers to doubt Plewa's credibility. Even taking her claims as true, it does not make Plewa's accusations less credible. Nor does it make an officer's belief that she may have committed a battery unreasonable. *See Matthews v. City of East St. Louis*, 675 F.3d 703, 707 (7th Cir. 2012) (holding defendant officers reasonably believed account of club owner that he was victim of plaintiffs' battery when club owner had no visible injuries and plaintiffs were badly beaten, in handcuffs, and protesting their innocence).

20

Second, Jones emphasizes that the Defendant Officers' failure to interview any witnesses besides Plewa before arresting her was unreasonable. Jones contends this failure amounted to willfully closing their eyes to facts negating probable cause to arrest and detain her. Had they taken such steps, she argues, probable cause would have dissipated. But Jones raises the investigatory burden on officers beyond what the Fourth Amendment requires. *See Matthews*, 675 F.3d at 707 (officers' refusal to watch clarifying video not unreasonable when probable cause already established through putative victim's statements). Sgt. Conneely and Comm. Rubio established probable cause after hearing the statements from Plewa and reasonably believing him. Interviewing additional witnesses may have established a justification for battery—i.e., that Jones was acting in self-defense against an aggressor—but this is an affirmative defense to, not an element of, battery. *See McBride*, 576 F.3d at 707. The statements of witnesses aligned with the suspect here may be persuasive, but they are not conclusive evidence of an affirmative defense. *See id.* The officers did not require other witnesses' statements after establishing probable cause, even statements suggesting an affirmative defense.

Jones points to *BeVier v. Hucal* for the proposition that it is unreasonable for officers to choose not to interview witnesses on the scene for clarifying information before arresting her. But *BeVier* is readily distinguishable. In that case, parents sued an officer who arrested them without probable cause for suspected child neglect. 806 F.2d 123, 125 (7th Cir. 1986). The Court agreed with the plaintiffs that the defendant officer had no probable cause to arrest when he observed the children in what he believed to be an unsafe situation, but he failed to ask any questions of the parents, the Red Cross Center personnel who received the children, or the children's teenage babysitter. *Id.* at 127. But there, the arresting officer had no information about the parents' intent, nor any information about whether the children's situation was attributable to the parents'

21

decisions—essential elements of the suspected offense. *Id.* at 128. In other words, he did not have evidentiary support for each element of the underlying crime, so he was obligated to continue to investigate before making a probable-cause determination. *Id.* Here, by contrast, the Defendant Officers had evidence of all required elements of battery. They had Plewa's statements that Jones had struck and spit on him. Their credit to his statements was not unreasonable, even if other witnesses gave an alternative version of events. *See Matthews*, 675 F.3d at 707.

Jones also points to *Guzell v. Hiller* to support her argument that the officers acted unreasonably, but this case is even less helpful to her. *Guzell* states that "police must act reasonably on the basis of what they know" and that they cannot "close their eyes to the additional information" already in their possession. 223 F.3d 518, 520 (7th Cir. 2000). But nothing here shows the Defendant Officers acted unreasonably based on what they knew, nor that they ignored exculpatory information that they already possessed. They had information from a complainant that a battery had been committed against him. Jones argues that the Defendant Officers had a duty to investigate further and that failing to do so was unreasonable under *Guzell*. This is not what *Guzell* stands for. Rather, once a reasonable investigation establishes probable cause, that investigation may end. *McBride*, 576 F.3d at 707.

Jones has not carried her burden to show that the Defendant Officers lacked probable cause to arrest and detain her. Accordingly, her false-arrest and unlawful-detention claim fails.

### c) *Failure to Provide Medical Attention*

Next, Jones brings a claim against all the Defendant Officers for failure to provide medical attention. (Dkt. 63 at 10 (Count III)). A Section 1983 claim for denial of medical care to an arrestee arises under the Fourth Amendment and is governed by the objective-reasonableness standard based on what the officer knows at the time. *Braun*, 56 F.4th at 551. "The inquiry considers: (1)

whether the officer ha[d] notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigative concerns." *Id.* (quoting *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011)). An officer may receive notice of an arrestee's medical need either through what he is told or his own observations. *Id.* (citing *Estate of Perry v. Wenzel*, 872 F.3d 439, 454 (7th Cir. 2017)).

Here, the parties dispute many facts material to the reasonableness inquiry. Jones provided evidence that when the Defendant Officers arrived on the scene, her face was bleeding. Her treating physician says that swelling would have happened within minutes, and the injury to her eye would have been visible within half an hour. Multiple people on the scene told the officers that Plewa had hit Jones's face. Though the Defendant Officers deny that they knew the extent of Jones's injuries until much later in the night—and that Cpt. Kane, Comm. Rubio, and Sgt. Conneely only saw Jones on the scene—the question of when the respective officers were placed on notice of Jones's injuries is disputed. The parties also dispute whether Jones ever asked for medical attention and was refused it. They further dispute whether Officers Dewitt, Patterson, or Galvan ever offered her medical attention at the police station.

Additionally, the parties dispute the seriousness of Jones's injuries. The Defendant Officers downplay her need for medical care, noting that the ER physician at Thorek discharged her with Tylenol. But Jones returned to another hospital the next day for additional treatment because of her pain. The doctors at both hospitals evaluated her for more serious injuries, permitting an inference that the circumstances of her injury (which the Defendant Officers presumably knew) were potentially very serious. Most significantly, the lockup keeper at the 19th District station recommended that she receive medical clearance before being processed. Jones suggests that the

lockup keeper "refused to process" her before the clearance, though the Defendant Officers dispute that characterization. Still, a jury may believe Jones's version and conclude that her injuries appeared objectively serious enough to have required immediate attention.

Reading the facts in the light most favorable to Jones, a reasonable jury may conclude that the Defendant Officers observed her face bleeding on the scene and heard that Plewa had hit her in the face. They might also conclude that some swelling in her left eye was visible before she was transported to the station. The jury could reasonably conclude that Cpt. Kane, Comm. Rubio, and Sgt. Conneely were therefore on notice of potentially serious injuries. They might also believe Jones's testimony that she asked the Defendant Officers multiple times for medical attention, including an ice pack, while handcuffed at the station with her eye swollen shut. A jury could reasonably find that Jones's need for medical attention was both obvious and serious from the lock-up keeper's refusal to process her, and that eight hours after the altercation was an unreasonably long time for her to wait to receive medical care. *See Florek v. Village of Mundelein*, 649 F.3d 594, 600 (7th Cir. 2011) ("[P]olice must do more to satisfy the reasonableness inquiry when the medical condition they confront is apparent and serious and the interests of law enforcement in delaying treatment are low.").

Because there are too many disputed material facts as to the Defendant Officers' notice of Jones's injuries, the seriousness of her medical need, and the scope of the required treatment weighed against police interests, summary judgment is not appropriate here.

### ii.  State Law Claims

#### a)  *Malicious Prosecution*

Bedford and Jones bring malicious-prosecution claims against Defendant Officers Dewitt, Galvan, and Patterson. (Dkt. 63 at 14–15 (Count VIII)). To recover on a malicious-prosecution

claim, a plaintiff must prove: "(1) The commencement of or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 26 (quoting *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996)). Any element's absence bars a malicious-prosecution claim. *Id.* Suits for malicious prosecution are not favored in law. *Id.* ¶ 24 (quoting *Joiner v. Benton Cmty. Bank*, 411 N.E.2d 229, 231 (Ill. 1980)).

Probable cause exists under Illinois law where an officer is aware of facts and circumstances sufficient to lead a prudent person to believe that an individual had committed or was committing an offense. *Coleman v. City of Peoria*, 925 F.3d 336, 350 (7th Cir. 2019) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)); *Poris v. Lake Holiday Prop. Owners Ass'n*, 983 N.E.2d 993, 1007–08 (Ill. 2013) (similar)). Probable cause for each offense charged is a complete defense to malicious prosecution. *Martinez v. City of Chicago*, 900 F.3d 838, 849 (7th Cir. 2018); *Beaman v. Freesmeyer*, 2021 IL 1256617, ¶ 116 ("Lack of probable cause for instituting the original proceedings is an indispensable element of an action for malicious prosecution.").

The Plaintiffs here cannot show an absence of probable cause, barring their malicious-prosecution claims. First, as discussed, the Defendant Officers had probable cause to arrest Jones. Comm. Rubio and Sgt. Conneely received information from the complainant—Plewa—that Jones had struck and spit on him. They reasonably believed he was telling the truth and arrested and detained her with probable cause. Thereafter, Jones and Bedford were charged with battery through the complaints Plewa signed, continuing the criminal proceedings against Jones and initiating them against Bedford, who was not arrested at the scene.

In addition to Plewa's statements in his complaints, the CPD Incident Report (written by Officer Patterson and reviewed by Officer Dewitt) listed both Jones and Bedford as battery offenders. The report describes the information that Plewa, Holmes, and Chmiel provided about Jones. It also describes Bedford striking people with "what appeared to be a white metal chain" and documents the recovery of a plastic beaded necklace that Bedford was purportedly using to strike people. (Dkt. 168-15 at 5). It is undisputed that Officers Dewitt, Patterson, and Galvan saw the surveillance video—which shows Bedford swinging something and hitting Plewa and others with it—before writing the report. In sum, Plewa's statements, his two signed complaints and the CPD Incident Report all describe facts and circumstances that would lead a prudent person to believe Jones and Bedford committed a battery against Plewa. This provides probable cause for the charges and defeats their claims. *See Martinez*, 900 F.3d at 849; *Beaman*, 2021 IL 1256617, ¶ 116.

Plaintiffs, however, call into question the credibility of the information the officers possessed to show an absence of probable cause for the misdemeanor battery charges. They again argue that the evidence shows the Defendant Officers unreasonably credited Plewa's statements and ignored the testimony of other eyewitnesses and the "obvious injuries to both plaintiffs" in their report. (Dkt. 167 at 19). This, they contend, could lead a jury to conclude that the Defendant Officers conducted a bad-faith investigation and essentially manufactured probable cause in the incident report for the charges. Plaintiffs cannot escape the fact, however, that the charges proceeded against Jones and were initiated against Bedford because *Plewa voluntarily signed misdemeanor battery complaints against them*.

Nor can they deny that the CPD Incident Report recites information provided by Plewa, Holmes, and Chmiel to officers on the scene, as well as observations from the surveillance video.

At best, the Defendant Officers reported incomplete information gathered at this stage and made minor, immaterial inconsistencies. For instance, the Plaintiffs point to the dispute over whether Bedford swung a plastic beaded necklace or a denim bra at Plewa to cast doubt on Plewa's credibility as a witness and the Defendant Officers' motives in writing their report. But these inconsistencies do not vitiate probable cause. *See Spiegel*, 196 F.3d at 724–26 (finding that defendant had probable cause to arrest and charge plaintiff despite victim waiting nearly a month to make a report, inconsistencies in the victim's report, and evidence suggesting that the victim's charge against plaintiff was retaliatory).

Because Jones and Bedford cannot show an absence of probable cause for the battery arrest and charges, the Defendant Officers are entitled to summary judgment on the malicious-prosecution claims.

### b) *Intentional Infliction of Emotional Distress*

Bedford brings an intentional infliction of emotional distress ("IIED") claim against Officer Dewitt for his use of force and for testifying—falsely, she claims—against her. (Dkt. 63 at 15–16 (Count IX)). Illinois follows the Restatement (Second) of Torts, § 46 (1965), for claims of intentional infliction of emotional distress. *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988). To recover, the plaintiff must prove (1) the defendant's conduct was "truly extreme and outrageous;" (2) the defendant intended either "that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress;" and (3) that the conduct in fact caused severe emotional distress. *Id.* (citing *Public Finance Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976)).

To be outrageous, the defendant's conduct "must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *Feltmeier v.*

*Feltmeier*, 798 N.E.2d 263, 274 (Ill. 2003). Further, "[t]he outrageousness of a defendant's conduct must be determined in view of all the facts and circumstances pleaded and proved in a particular case." *Id.* (quoting *McGrath*, 533 N.E.2d at 811). The "degree of power or authority which a defendant has over a plaintiff can impact whether that defendant's conduct is outrageous," and the "more control which a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed outrageous . . . ." *McGrath*, 533 N.E.2d at 809. The Restatement identifies police officers as an example of a person with authority over others. *Id.* at 810 (citing Restatement (Second) of Tort § 46, cmt. e, at 74 (1965)).

The parties dispute the underlying facts of Officer Dewitt's use of force on Bedford. Taking them in the light most favorable to her, a jury could conclude that Officer Dewitt deployed an unnecessarily forceful "choke-slam" when he arrived on the scene. Bedford also argues that Officer Dewitt caused her emotional distress by lying about his misconduct in police reports and sworn testimony at her criminal trial. Although Bedford has not put forth evidence that Officer Dewitt lied in police reports, she has pointed to a few instances of his trial testimony that she characterizes as lies because they are inconsistent with other evidence.[3] The question then becomes whether this conduct, read in the light most favorable to Bedford, can support a claim for intentional infliction of emotional distress. It can.

---

[3] First, Bedford points out that the CPD Incident Report—written by Officer Patterson and reviewed by Officer Dewitt—says nothing about Bedford punching Plewa, and that Officer Dewitt only testified to this detail later. (Dkt. 195 ¶ 24). But this omission, even if material, is a far cry from lying, and the report does say she was striking someone with an object that appeared to be a chain. Second, she cites to Officer Dewitt's trial testimony and the Facebook Video to show he testified inconsistently about his use of force. (*See* dkt. 195 ¶¶ 28–29; Facebook Video at 00:27–00:29). She also cites to Officer Dewitt's trial testimony, his deposition, and the Facebook Video to show that Officer Dewitt testified to seeing Bedford punch Plewa and having pulled Bedford off Plewa, when the video shows Holmes standing between her and Plewa, such that there is about three feet of distance between them. (*See* dkt. 195 ¶¶ 28–30; Dkt. 168-12 at 371:7–15; Facebook Video at 00:27–00:29). Taking the facts in the light most favorable to Bedford, a jury could infer that Officer Dewitt intentionally lied about seeing her punch Plewa and pulling her off him, rather than made a mistake or forgot how the events unfolded.

Even a single instance of excessive use of force may be considered outrageous conduct. *See, e.g.*, *Delgado v. Village of Rosemont*, No. 03 C 7050, 2004 WL 422669, at *4 (N.D. Ill. Feb. 24, 2004) (plaintiffs' allegations that defendant security guards "savagely and publicly engaged in the excessive use of force against them" sufficient to meet Illinois threshold requirement for outrageous conduct). As a police officer, Officer Dewitt was in a position of authority over those at the scene of the Big City Tap incident, as well as throughout the investigation. Defendants counter that Officer Dewitt acted reasonably in his use of force. But they assume the truth of their version of the facts without acknowledging those facts are disputed. Further, knowingly fabricating evidence to implicate someone in a crime constitutes outrageous conduct. *See Bianchi v. McQueen*, 58 N.E.3d 680, 700 (Ill. App. Ct. 2016). The underlying facts here are disputed, so a jury might believe Bedford and conclude that Officer Bedford's conduct was extreme and outrageous.

Second, Defendants argue that Bedford cannot show that Officer Dewitt intended to cause Bedford severe emotional distress, nor that he knew there was at least a high probability of causing her severe emotional distress. *See McGrath*, 533 N.E.2d at 809. They point out that Officer Dewitt did not know Bedford suffered from mental illness or anxiety and had no reason to know she would be especially susceptible or sensitive. But this argument focuses on Bedford's particularized reaction to Officer Dewitt's conduct, rather than Officer Dewitt's subjective intentions in his conduct as the second IIED element requires. The facts going to Officer Dewitt's intentions are disputed. The parties dispute the level of force that Officer Dewitt used against Bedford, which a jury might conclude was excessive—possibly recklessly so. Bedford also points to inconsistencies between Officer Dewitt's trial testimony and other evidence in the record. His intentions in testifying against her are likewise disputed. Whether he was lying on the stand to protect himself from liability for misconduct depends on a jury's assessment of Officer Dewitt's credibility, which

29

the Court cannot determine at summary judgment. *See Flowers*, 46 F.4th at 636. A jury could side with Bedford and against Officer Dewitt to conclude that he acted intentionally or recklessly to cause her severe emotional distress.

Finally, Defendants challenge the causation element of the IIED claim. *See McGrath*, 533 N.E.2d at 809. "The term 'proximate cause' embodies two distinct concepts: cause in fact and legal cause." *Turcios v. DeBruler Co.*, 32 N.E.3d 1117, 1124 (Ill. 2015). Defendants here do not contest cause in fact. They argue that Bedford cannot show that Officer Dewitt's conduct proximately caused her emotional distress.[4] For proximate cause, "[c]ourts ask whether the injury is the type of injury that a reasonable person would see as a 'likely result' of his or her conduct, or whether the injury is so 'highly extraordinary' that imposing liability is not justified." *Id.* (citing *Lee v. Chicago Transit Authority*, 605 N.E.2d 493, 503 (Ill. 1992)).

Defendants contend that Bedford's severe emotional distress arose from experiencing a psychogenic seizure after falling, and that her pre-existing anxiety caused this condition rather than Officer Dewitt. They argue that under these circumstances, Bedford cannot show Officer Dewitt's conduct proximately caused Bedford's severe emotional distress. Her seizure was not foreseeable to him. But Bedford describes emotional distress resulting from Officer Dewitt's use of force itself, not merely from falling and undergoing a seizure immediately afterwards. She further describes experiencing emotional distress from what she characterizes as his false testimony against her. Defendants have not shown that it would be unforeseeable for a person to experience severe emotional distress arising from an unjustified and excessive use of force or from

---

[4] Defendants do not challenge in their brief whether Bedford submitted evidence showing that she experienced severe emotional distress after this incident. They assume she has, and Bedford will have to put forth evidence sufficient to establish this element to succeed on her claim. *See Adams v. Sussman & Hertzberg, Ltd.*, 684 N.E.2d 935, 942 (Ill. 1997) (plaintiff's emotional distress "must be so severe that no reasonable person could be expected to endure it"); *but see also Kolegas v. Heftel Broadcasting Corp.*, 607 N.E.2d 201, 213 (Ill. 1992) ("Severe emotional distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed." (quoting Restatement (Second) of Torts, § 46, cmt. j, at 77–78 (1965))).

false incriminating testimony presented at trial by a person in a position of authority. Bedford has presented a triable issue of fact on the element of causation.

Bedford's IIED claim against Officer Dewitt survives summary judgment.

### iii. Contingent Claims of Conspiracy and Supervisor Liability

#### a) Conspiracy

Next, Jones and Bedford both bring claims against all individual Defendants of a conspiracy to deprive Plaintiffs of their rights both under Illinois law and the federal Constitution.[5] (Dkt. 63 at 10–11 (Count IV)). "To establish conspiracy liability in a § 1983 claim, the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Holloway v. City of Milwaukee*, 43 F.4th 760, 769 (7th Cir. 2022) (quoting *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015)). Similarly, under Illinois law, a plaintiff must plead and prove:

> (1) the existence of an agreement between two or more persons (2) to participate in an unlawful act or a lawful act in an unlawful manner, (3) that an overt act was performed by one of the parties pursuant to and in furtherance of a common scheme, and (4) an injury caused by the unlawful overt act.

*Lewis v. Lead Indus. Ass'n*, 178 N.E.3d 1046, 1053–54 (Ill. 2020).

A Section 1983 conspiracy claim requires an underlying deprivation of a constitutional right. *Holloway*, 43 F.4th at 769. Defendants prevail at summary judgment on Jones's false-arrest and unlawful-detention claims. Although Bedford's excessive-force claim survives summary judgment, this claim is against Officer Dewitt alone. She cannot show that Officer Dewitt reached

---

[5] Plaintiffs allege civil conspiracy against all individual defendants. The BCT Defendants join the Defendant Officers' motion for summary judgment on the civil-conspiracy claims. (Dkt. 143 at 5 n.1). They also address the civil-conspiracy claims in their own motion for summary judgment. (Dkt. 143 at 6–10). For efficiency, the Court addresses Plaintiffs' conspiracy claims against the BCT Defendants together with their conspiracy claims against the Defendant Officers.

any agreement with any other defendant to use force against her. He arrived first on the scene and almost immediately grabbed her without speaking to Plewa or any other officer.

The only remaining constitutional-rights violation is Jones's claim against the Defendant Officers for unreasonable delay in providing medical care while she was under arrest. But neither the Complaint nor Plaintiffs' brief argues that the Defendant Officers and Plewa conspired to deprive Jones of medical attention. Their conspiracy claim focuses entirely on false arrest and malicious prosecution as the underlying torts, with the motive of protecting Plewa and covering up Officer Dewitt's excessive use of force. (*See* dkt. 63 ¶¶ 63–66; dkt. 167 at 25–27). Further, Jones has provided no evidence—direct or circumstantial—that the Defendant Officers agreed amongst themselves and/or with Plewa to deprive her of medical attention. Plaintiffs, therefore, cannot sustain a Section 1983 conspiracy claim against any individual defendants.

Plaintiffs also argue that all individual defendants are liable under Illinois law for conspiring to commit the underlying tort of malicious prosecution. (*See* dkt. 167 at 25–27; dkt. 174 at 6–12). But the Plaintiffs' claim of malicious prosecution against the Defendant Officers ends with their failure to show an absence of probable cause to arrest Jones and to charge Jones and Bedford with misdemeanor battery. Plaintiffs' malicious-prosecution claims against Defendant Plewa individually (and Defendant 1000 Liquors on a respondeat superior theory) proceed.[6] But surviving malicious-prosecution claims against the BCT Defendants cannot support a civil-conspiracy claim without the alleged co-conspirators. When the Defendant Officers drop

---

[6] The BCT Defendants make no argument for summary judgment in their favor on the Plaintiffs' malicious-prosecution claims. (Dkt. 63 at ¶¶ 83, 84, 87 (malicious prosecution alleged against the BCT Defendants); Dkt. 174 at 1 n.1 (noting that BCT Defendants have not moved for summary judgment on Count VIII against the BCT Defendants); Dkt. 143 (BCT Defendants' brief in support of motion for summary judgment)).

out of the claim, Plewa is left alone.[7] The conspiracy claim requires an agreement amongst two or more persons. *See Lewis*, 178 N.E.3d at 1053–54.

The Court grants summary judgment on the Plaintiffs' conspiracy claims against all individual defendants.

### b) *Supervisor Liability*

Finally, Bedford and Jones also bring claims of supervisor liability against Cpt. Kane, Comm. Rubio, and Sgt. Conneely (together the "Defendant Supervisors") for directing Officers Dewitt, Galvan, and Patterson to falsely arrest Jones and to maliciously prosecute both Plaintiffs. (Dkt. 63 at 16–17 (Count X)). Bedford also asserts a supervisory liability claim against Comm. Rubio for condoning Officer Dewitt's excessive use of force, and Jones asserts a supervisory liability claim against the Defendant Supervisors for failing to ensure she received medical care while in custody. (*Id.*; *see also* dkt. 167 at 27). The Defendant Officers prevail on summary judgment in the false-arrest and malicious-prosecution claims. Both Jones's Section 1983 claim for a failure to provide timely medical care and Bedford's Section 1983 use-of-force claim against Officer Dewitt remain.

Under Section 1983, "a government official is only liable for his or her own misconduct." *Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021) (quoting *Locke v. Haessig*, 788 F.3d 662, 669 (7th Cir. 2015)). A supervisor is liable for a subordinate's misconduct resulting in constitutional violation only if the supervisor was personally involved. *Id.* "Personal involvement in a subordinate's constitutional violation requires supervisors to know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Id.* at 494 (internal quotation marks omitted).

---

[7] Defendant 1000 Liquors, Inc., is an entity, not a natural person, and therefore cannot agree to take an overt act in furtherance of the alleged underlying tort. (Dkt. 63 ¶ 3).

The parties dispute whether Comm. Rubio and Sgt. Conneely—who arrested Jones—or Cpt. Kane—who heard other witnesses say that Plewa had punched Jones in the face—knew about Jones's injuries while on the scene before nondefendant officers took her to the station. If the Defendant Supervisors deprived Jones of her constitutional rights by failing to ensure medical attention during and immediately after her arrest, then they are individually liable for their own actions. (*See* dkt. 63 ¶ 60 (Count III)). The subordinate officers did not participate in the arrest; they were only involved with Jones's detention at the station a few hours later. Jones has not provided any evidence that the Defendant Supervisors knew about, were involved in, approved, or condoned any of the decisions that Officers Dewitt, Galvan, and Patterson made regarding Jones's medical treatment after she was taken off the scene. Neither the Complaint nor Plaintiffs' brief in opposition to summary judgment makes any argument or supplies any evidence on this point.

Finally, it is undisputed that Officer Dewitt used force against Jones before any of the Defendant Supervisors arrived on the scene. Afterwards, Comm. Rubio reviewed and approved Officer Dewitt's Tactical Response Report. He concluded that Officer Dewitt had complied with department policy and directives and did not recommend further action. If a jury concludes that Officer Dewitt used excessive force, and if Dewitt is not qualifiedly immune, then Comm. Rubio could be held liable for approving and condoning Officer Dewitt's misconduct. *See Taylor*, 999 F.3d at 493–94. So, Jones's claim of supervisory liability against Comm. Rubio survives summary judgment.

The Court grants in part and denies in part the Defendant Officers' Motion for Summary Judgment. (Dkt. 150). Bedford's excessive-use-of-force and IIED claims against Officer Dewitt (Counts I, IX); Jones's claim for denial of medical attention against all Defendant Officers (Count III); and the supervisory-liability claim against Comm. Rubio (Count X) survive.

**B.**    **Big City Tap Defendants' Motion for Summary Judgment[8]**

   **i.  Negligence**

Bedford and Jones assert negligence claims against the BCT Defendants Joseph Plewa and 1000 Liquors, Inc. (Dkt. 63 at 11–13 (Counts V–VI)). Under Illinois law, a plaintiff alleging negligence must prove: (1) the defendant owed plaintiff a duty, (2) the defendant breached that duty, and (3) the defendant's breach proximately caused plaintiff's injuries. *Roh v. Starbucks Corp.*, 881 F.3d 969, 973 (7th Cir. 2018) (citing *Mt. Zion State Bank & Trust v. Consol. Commc'ns, Inc.*, 660 N.E.2d 863, 868 (Ill. 1995)). "Under the theory of respondeat superior, or vicarious liability, an employer may be liable for his employee's torts when those torts were committed within the scope of employment." *McQueen v. Green*, 2022 IL 1180648, ¶ 37.

The parties agree that Plewa is an employee-agent of 1000 Liquors and was acting at all relevant times within the scope of his employment. (Dkt. 175 ¶ 3; Dkt. 63 ¶ 69). The BCT Defendants concede that they owed Bedford and Jones a duty. But the BCT Defendants contest this duty's applicable standard of care. They argue that a professional standard of care applies here, rather than ordinary, due care. Accordingly, they insist that Bedford and Jones needed to present expert testimony to prevail on their negligence claims. Further, the BCT Defendants challenge the Plaintiffs' ability to prove the breach and proximate cause elements.

Ordinary negligence cases do not require expert testimony as to the applicable standard of care. *Jones v. Chi. HMO Ltd. of Ill.*, 730 N.E.2d 278, 295 (Ill. 2000). A defendant need only act as would an "ordinarily careful person" or a "reasonably prudent person," which requires no expert

---

[8] The BCT Defendants do not move for summary judgment on Jones's claim of assault and battery under Illinois law. (Dkt. 143 at 5; Dkt. 63 at 13–14 (Count VII)). Plaintiffs also bring malicious-prosecution claims against the BCT Defendants. (Dkt. 63 at ¶¶ 83, 84, 87 (Count VIII); Dkt. 174 at 1 n.1). The BCT Defendants make no argument for summary judgment on Plaintiffs' malicious-prosecution claims. (*See generally* dkt. 143). The Court addressed the Plaintiffs' conspiracy claims against both the Defendant Officers and the BCT Defendants in Section A.iii.a, *supra*. (Dkt. 63 at 10–11 (Count IV)).

understanding. *Id.* (citing *Advincula v. United Blood Servs.*, 678 N.E.2d 1009, 1020 (Ill. 1996)). By contrast, in a professional negligence case, the defendant is held to the "ordinarily careful professional" standard. *Id.* Such cases require expert testimony "to establish both (1) the standard of care expected of the professional and (2) the professional's deviation from the standard." *Id.* (citing *Purtill v. Hess*, 489 N.E.2d 867, 872 (Ill. 1986)). "The rationale for requiring expert testimony is that a lay juror is not skilled in the profession and thus is not equipped to determine what constitutes reasonable care in professional conduct without the help of expert testimony." *Id.* (citing *Advincula*, 679 N.E.2d at 1020).

The Illinois Supreme Court has recognized such professionals as physicians, attorneys, dentists, accountants, and social workers. *Advincula*, 679 N.E.2d at 1020–21 (collecting cases). The Restatement (Second) of Torts § 299A, cmt. b (1965)—which Illinois follows, *see id.* at 1020—also includes pharmacists, oculists, accountants, and engineers. The Restatement further applies this standard to individuals who "render services to others in the practice of a skilled trade, such as that of airplane pilot, precision machinist, electrician, carpenter, blacksmith, or plumber." § 299A, cmt. b.

The BCT Defendants have cited no Illinois caselaw categorizing bar bouncers or bar owners—nor even trained security guards, a dubious job title to ascribe to the relevant individuals here—as learned professionals or members of a skilled trade rendering services to the public. They cite to a single case holding that expert testimony was required to establish the standard of care applicable to licensed aestheticians. *See Colburn v. Mario Tricoci Hair Salons & Day Spas, Inc.*, 972 N.E.2d 266, 276 (Ill. App. Ct. 2012). First, that case is distinguishable, as that plaintiff initially forfeited the argument that hers was an ordinary negligence case. *See id.* at 276–77. Bedford and Jones have not. (Dkt. 174 at 12–13). Second, the BCT Defendants make no attempt to analogize

36

the training and licensing regimes the Illinois appellate court found applicable to aestheticians in *Colburn* to any education, training, or specialized skills required to manage security at a bar. They reference only the Big City Tap employees' BASSET training to suggest special training or skills are required beyond an average juror's understanding. (Dkt. 175 ¶ 11). But such training is irrelevant here. Defendants admit that BASSET training enables bar employees to identify and address issues with intoxicated patrons and avoid overserving those patrons. (*Id.*) Bedford and Jones were not patrons of Big City Tap; they were standing outside on the sidewalk, not drinking in the bar. They never even stepped foot inside the establishment.

This is an ordinary negligence case requiring no expert testimony. An average juror can understand the duty of ordinary care that a reasonably prudent bar bouncer or bar owner owes non-patrons standing outside their establishment to avoid injuring them.

Moving to the claim's merits, there are too many disputed facts to determine whether the BCT Defendants breached their duty of ordinary care to Bedford and Jones. In a negligence claim, "breach of duty and proximate cause present questions of fact for the jury to decide." *Thompson v. Gordon*, 948 N.E.2d 39, 45 (Ill. 2011). The parties dispute what happened leading up to the altercation outside Big City Tap. They also dispute the training and security protocols the BCT Defendants had in place for its employees at the time, whether they were followed in this instance, and whether they were adequate under the circumstances.

Reading the facts in the light most favorable to Bedford and Jones, a jury could find that Plewa recruited untrained or barely trained employees—or even some non-employees—to help him forcibly clear nonviolent citizens from a public sidewalk. According to the Plaintiffs, he approached them in a threatening, hostile manner while spewing racial slurs that could foreseeably antagonize the crowd. When tempers flared, Plewa and his bouncers resorted to violence rather

than contact the police standing only a block away. A reasonable jury could believe the Plaintiffs' version of events and find that Plewa did not act with ordinary care in this situation.

Finally, the BCT Defendants baldly state, without argument, that "[t]here is no evidence that Big City Tap or Mr. Plewa were responsible for any injury to Bedford."[9] (Dkt. 143 at 12). They make no such claim as to Jones, who submitted evidence of Plewa punching her, dragging her down the street by her hair, pulling out her braids, and causing injuries that required care at the hospital. Jones also proffered evidence of emotional injuries.

As to Bedford, however, whether Plewa proximately caused her injuries must go to the jury. *See Thompson*, 948 N.E.2d at 45; *see also Suzik v. Sea-Land Corp.*, 89 F.3d 345, 349 (7th Cir. 1996) ("Whenever the injury-causing accident is of the kind that the defendant could reasonably foresee, proximate cause is a question for the jury.") (applying Illinois law). Proximate cause

> embodies two distinct concepts: cause in fact and legal cause. When considering cause in fact, courts generally employ either the traditional "but for" test or the "substantial factor" test. Under the "but for" test, a defendant's conduct is not the cause of an event if the event would have occurred without it. Under the "substantial factor" test, the defendant's conduct is said to be a cause of an event if it was a material element and a substantial factor in bringing the event about. In contrast, legal cause involves an assessment of foreseeability. Courts ask whether the injury is the type of injury that a reasonable person would see as a "likely result" of his or her conduct, or whether the injury is so "highly extraordinary" that imposing liability is not justified.

*Turcios*, 32 N.E.3d at 1124.

---

[9] The BCT Defendants mistakenly refer to this as the damages element of the negligence claim. (Dkt. 143 at 12 ("Since damages are a necessary element of a negligence claim, this serves as another reason why the Big City Tap defendants are entitled to judgment in their favor on Counts V and VI.")). But Bedford's physical injuries are not disputed; she required treatment at the hospital after falling and experiencing psychogenetic seizures. Rather, the BCT Defendants contest *causation*. (Dkt. 143 at 12 ("There is no evidence that Big City Tap or Mr. Plewa *were responsible for* any injury to Bedford.")). The issue is not whether Bedford experienced injury, but whether Plewa's conduct—assuming he breached his duty of ordinary care toward her—proximately caused her injury.

Here, a reasonable jury could conclude that Plewa's actions were both the cause in fact and legal cause of Bedford's injuries. But for Plewa's negligence in managing the crowd, Bedford would not have become involved in a chaotic physical altercation that resulted in police intervention and (according to her) being slammed to the ground by police. Her putative injury—being slammed to the ground forcefully enough to require hospitalization—is not completely unforeseeable where a defendant's verbal and physical provocations cause a fight to break out in a crowd.

There are many disputed facts material to both breach and causation here—elements that hinge on a jury's factual findings. Summary judgment is inappropriate on Bedford's and Jones's negligence claims (Counts V–VI).

### ii. Intentional Infliction of Emotional Distress

Finally, Bedford and Jones each bring IIED claims against Plewa and against 1000 Liquors on a respondeat superior theory. (Dkt. 63 at 15–16 (Count IX)). The BCT Defendants first argue that Plewa's conduct does not meet Illinois's high threshold of "extreme and outrageous." *See McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988) (reciting elements of IIED claim); *Feltmeier v. Feltmeier*, 798 N.E.2d 263, 274 (Ill. 2003) (describing threshold for extreme and outrageous conduct).

The parties dispute Plewa's conduct that Bedford and Jones allege caused their severe emotional distress. According to the Plaintiffs, Plewa approached them with several large men in a hostile and threatening manner. He spewed racial epithets at the group. Reacting to a liquid thrown at him, he punched Jones in the face and grabbed her by the hair, dragged her along the ground, and knelt on her neck to prevent her from breathing. He then—according to the Plaintiffs—lied to the police about what happened, filed false misdemeanor battery charges against

them, and caused them to endure the stress of criminal proceedings premised on his lies. If a jury accepts the Plaintiffs' version of events, such conduct could be considered extreme and outrageous. *See Bianchi*, 58 N.E.3d at 701 (holding that defendants' deliberate fabrication of evidence for purpose of falsely and maliciously charging plaintiffs meets standard for extreme and outrageous conduct).

They also argue that Jones has not shown that she suffered sufficiently severe emotional distress to be actionable. Under Illinois law, mere anxiety that a person suffers after an arrest and criminal charges is not "severe" emotional distress. *See Fricano v. Chicago White Sox, Ltd.*, 2012 IL App (1st) 101978-U, ¶ 70 (no severe emotional distress when plaintiff had anxiety and trouble sleeping and eating as a result of arrest and criminal proceedings); *Adams*, 684 N.E.2d at 942 (no severe emotional distress when plaintiff suffered shame, humiliation, and worry as a result of criminal trespass charges); *Khan v. American Airlines*, 639 N.E.2d 210, 215 (Ill. 1994) (no severe emotional distress when plaintiff had problems sleeping, fears of being arrested again, and recurring nightmares of being arrested).

Here, though, both Jones and Bedford allege a much broader and more extreme set of circumstances than merely facing arrest and criminal charges. Jones suffered physical injuries from Plewa. Moreover, according to the Plaintiffs, Plewa deliberately fabricated evidence designed to wrongfully incriminate them. *See Bianchi*, 58 N.E.3d at 701. Illinois recognizes that "in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed." *Kolegas v. Heftel Broadcasting Corp.*, 607 N.E.2d 201, 213 (Ill. 1992) (quoting Restatement (Second) of Torts, § 46, cmt. j, at 77–78 (1965)). Finally, Jones provided evidence that she was so distressed from these events that she saw a therapist three times and a religious counselor once.

The Court denies summary judgment on Bedford's and Jones's IIED claims against the BCT Defendants (Count IX).

In sum, the Court grants in part and denies in part the BCT Defendants' Motion for Summary Judgment. (Dkt. 142). The Court grants the BCT Defendants summary judgment on both Plaintiffs' conspiracy claims (Count IV). All other claims against the BCT Defendants survive summary judgment, (Counts V, VI, VII, VIII, IX).

## C.     City of Chicago's Motion for Summary Judgment

### i.   *Monell* Claim

Municipalities are not vicariously liable under Section 1983 for the constitutional torts of their employees. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A plaintiff must show that a municipal policy or custom caused the constitutional injury. *Bohanon v. City of Indianapolis*, 46 F.4th 669, 672 (7th Cir. 2022) (citing *Monell*, 436 U.S. at 694). Three types of municipal action can support *Monell* liability: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Id.* at 675 (quoting *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019)). Here, Bedford and Jones claim the second type of municipal action is at play: a widespread practice amongst CPD officers upholding a "code of silence," wherein officers lie for each other to cover up the excessive force of brother officers. (Dkt. 63 ¶¶ 102–03).

After establishing a widespread policy or practice, a *Monell* plaintiff must show municipal fault. *Bohanon*, 46 F.4th at 675 (citing *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021)). The municipality may be at fault when it acts, or directs an employee to act, in a facially unconstitutional manner. *Id.* (citing *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*,

520 U.S. 397, 404–05 (1997)). Alternatively, the municipality may be at fault when the plaintiff can "prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *Id.* (quoting *First Midwest Bank ex rel. Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021)). Here, Bedford and Jones allege the latter.

Finally, the plaintiff must show a "direct causal link between the challenged municipal action and the violation of his constitutional rights." *Id.* at 675–76 (citing *LaPorta*, 988 F.3d at 987). This is a "rigorous causation standard." *Id.*

"In short, a *Monell* plaintiff must show that some municipal action directly caused him to suffer a deprivation of a federal right, and that the municipality took the action with conscious disregard for the known or obvious risk of the deprivation." *Dean*, 18 F.4th at 236. Together, the three requirements for a *Monell* claim "must be scrupulously applied to avoid a claim for municipal liability backsliding into an impermissible claim for vicarious liability." *Bohanon*, 46 F.4th at 675–76 (internal quotation marks omitted).

Bedford and Jones base their *Monell* claim on Officer Dewitt's use of force, which Bedford claims deprived her of her Fourth Amendment rights. This claim survives summary judgment, satisfying at this stage the *Monell* claim's threshold requirement for a constitutional injury.[10] They argue that the City "has a *de facto* policy, practice, and/or custom of a Code of Silence that conceals and/or suppresses the investigation of officer misconduct and the disciplining of officers who commit misconduct, including the use of unlawful force." (Dkt. 63 ¶ 103; *see also id.* ¶¶ 104–06 (describing other aspects of the alleged code of silence)). They further allege that the City is aware

---

[10] Jones's claim for violation of her Fourth Amendment rights by the Defendant Officers' alleged failure to provide medical attention survives summary judgment as well. But Plaintiffs alleged no municipal policy or practice related to this constitutional injury. (*See* dkt. 63 at 17–18 (Count XI)). This claim against the Defendant Officers, therefore, cannot sustain a *Monell* claim.

that this custom and practice exists and threatens citizens' constitutional rights but is indifferent to it. (*Id.* ¶¶ 112–13). Finally, they allege this custom and practice directly resulted in Bedford's constitutional injury. (*Id.* ¶¶ 113–15). But the Plaintiffs have failed to adduce evidence at this stage to carry their burden on all three required elements. *See Celotex Corp.*, 477 U.S. at 322.

First, Bedford and Jones have failed to adduce sufficient evidence to support a reasonable jury finding that such a code of silence existed and was widespread in June 2018. Beyond their own single incident involving a handful of officers, they rely entirely on the statements of former Mayor Rahm Emanuel in December 2015 and generalized conclusions about the code of silence and officers' use of excessive force from the April 2016 PATF Report and January 2017 DOJ Report.[11] These investigations, conducted a year or more before this incident occurred and— notably—before CPD instituted reforms in 2016–17, are insufficient to demonstrate a widespread, pervasive code of silence when Officer Dewitt encountered Bedford. *See, e.g.*, *Black v. City of Chicago*, No. 18-cv-6518, 2022 WL 425586, at *5–*6 (N.D. Ill. Feb. 11, 2022) (finding 2016 PATF's conclusion about the high rate of searches and seizures of African Americans too general to support alleged widespread practice). Plaintiffs fail to give examples of any misconduct cover-ups at any time after these reports' issuance. If nothing within CPD had changed in the subsequent 18 months or more, other examples should be readily discoverable. *See Taylor v. Hughes*, 26 F.4th 419, 437 (7th Cir. 2022) (concluding that discovery would have turned up evidence of other similar instances if CPD's practice were widespread).

---

[11] The Plaintiffs also seek to introduce evidence about CPD's progress in fulfilling its obligations under the 2019 federal consent decree through citation to an online Chicago Sun-Times article. (Dkt. 199 ¶¶ 26–27). The statements contained in this article are inadmissible hearsay and will not be admitted into evidence. *See Stollings v. Ryobi Tech., Inc.*, 725 F.3d 753, 761 (7th Cir. 2013) (newspaper articles inadmissible hearsay when offered for truth of the matter asserted).

To suggest that a reasonable jury could find that a code of silence existed within CPD, Plaintiffs cite to several cases from this district that discussed and considered evidence of such a de facto policy. (Dkt. 171 at 5–7). But Plaintiffs failed to cite to a single case—other than their own—filed after 2016. Those cases involved incidents that occurred well before the referenced reports, CPD's reforms, and June 2018.[12] Plaintiffs argue that all this historic evidence shows there is a genuine issue of material fact as to whether the City "defeated the Code of Silence before Pride Parade in 2018." (Dkt. 171 at 5). But it is not the City's burden to prove that it defeated the code of silence by 2018. It remains the Plaintiff's burden to establish that such a widespread practice existed at the time relevant to these events. They fail to meet it here.

Even if Plaintiffs could carry their burden on the issue of a widespread practice, Plaintiffs cannot demonstrate municipal fault. They must show that the City both knew of the widespread practice and was deliberately indifferent to it. *Bohanon*, 46 F.4th at 675. But the City made numerous reforms and implemented mechanisms to address excessive-force instances and investigate them. Given such evidence, Plaintiffs face a high bar to show that the City is

---

[12] *Estate of Loury v. City of Chicago*, No. 16-cv-4452, 2019 WL 1112260, at *3 (N.D. Ill. Mar. 11, 2019) (denying summary judgment on *Monell* claim for use-of-force incident that occurred in April 2016, finding reports created genuine issue of material fact about existence of code of silence); *Cazares v. Frugoli*, No. 13 C 5626, 2017 WL 1196978, at *1 (N.D. Ill. Mar. 31, 2017) (denying summary judgment in *Monell* claim for officer misconduct that occurred in April 2009, finding reports created genuine issue of material fact about existence of code of silence); *Marcinczyk v. Plewa*, No. 09 C 1997, 2012 WL 1429448, at *1–2 (N.D. Ill. Apr. 25, 2012) (denying summary judgment in *Monell* claim for officer misconduct that occurred in April 2007, finding statistical reports and public records created genuine issue of material fact of custom and practice); *Obrycka v. City of Chicago*, No. 07 C 2372, 2012 WL 601810, at *1, *7–8 (N.D. Ill. Feb. 12, 2012) (denying summary judgment in *Monell* claim for officer misconduct that occurred in February 2007, finding expert opinion testimony provided sufficient evidence to create genuine issue of material fact of de facto code of silence); *Gilfand v. Planey*, No. 07 C 2566, 2011 WL 4036110, at *9 (N.D. Ill. Sept. 9, 2011) (City conceded genuine issue of material fact existed as to de facto policy of failing to properly investigate incidents of excessive force involving off-duty police officers, for misconduct that occurred in December 2006); *Johnson v. City of Chicago*, No. 05 C 6545, 2009 WL 1657547, at *9 (N.D. Ill. June 9, 2009) (City conceded genuine issue of material fact existed as to de facto policy of failing to properly investigate and discipline police misconduct, for incident that occurred in April 2005); *Klipfel v. Gonzales*, No. 94 C 6415, 2006 WL 1697009, at *11 (N.D. Ill. June 8, 2006) (finding that opinion testimony of prosecutor created genuine issue of material fact as to whether a "blue wall of silence" to cover up misconduct existed within the CPD at time of misconduct that occurred in 1993); *Garcia v. City of Chicago*, No. 01 C 8945, 2003 WL 1845397, at *7 (N.D. Ill. Mar. 20, 2003) (finding evidence from expert opinion witness created genuine issue of material fact as to whether CPD adequately investigated misconduct, for misconduct that occurred in February 2001).

deliberately indifferent to a purported widespread practice of covering up excessive-force incidents. *See Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 617 (7th Cir. 2022) (providing evidence that "municipal action amounts to deliberate indifference" in plaintiff's *Monell* claim is "a high burden to clear"). They have not surmounted it.

Plaintiffs rely on evidence from independent monitor reports indicating that the City has not reached full compliance with the January 2019 federal consent decree. This, they suggest, demonstrates that the City is not serious about its reforms for CPD. But failure to reach full compliance within a few years is a far cry from a complete failure to act. Moreover, the Plaintiffs point to no specific information within the independent monitor reports that suggests the City remains deliberately indifferent to preventing excessive use of force or investigating such incidents. Indeed, the Plaintiffs point to no specific information in the reports at all. Their evidence purporting to show the City's deliberate indifference remains vague and conclusory.

The Plaintiffs also suggest that the Defendant Supervisors' denial of any code of silence within CPD is, itself, evidence of deliberate indifference to the code's existence. This circular reasoning cannot carry the day. True, if a code of silence existed, its adherents would likely deny it. But so, too, would officers deny the existence or their awareness of a code of silence if it truly did not exist, or if they were unaware of it.

Finally, the Plaintiffs assert as evidence of the City's deliberate indifference to police misconduct the proposition that Comm. Rubio assigned Officers Dewitt, Galvan, and Patterson to investigate Officer Dewitt's own misconduct. This is both factually inaccurate and off track. Comm. Rubio assigned them to investigate what happened between the Big City Tap employees and Jones, Bedford, and their group. Officer Dewitt did not investigate his own use of force; Comm. Rubio did. Moreover, this returns to the specific facts of this case, which is insufficient to

show deliberate indifference to a widespread de facto policy known to the City. *See Stockton*, 44 F.4th at 617 (*Monell* plaintiff failed to establish deliberate indifference when he relied heavily on single, isolated experience but gave no evidence of similar harms to others).

The final *Monell* element—causation—similarly falls short. Plaintiffs cannot show by the requisite rigorous standard of causation that the City's action was the "moving force" behind Bedford's constitutional injury and directly deprived her of her rights. *See Bohanon*, 46 F.4th at 675–76. The City provided evidence that, according to CPD's reforms and trainings, the Defendant Officers knew their uses of force would be reported and investigated. Indeed, Officer Dewitt's use of force was reported and investigated, both by his supervisor and by COPA.

Plaintiffs, in turn, argue that there is genuine issue of material fact as to causation, because they speculate that Officer Dewitt acted as he did because he knew other officers would lie for him to cover up his misconduct. Plaintiffs rely on *Cazares v. Frugoli*, where the *Monell* plaintiff showed an officer knew he could act with impunity, such that causation could be inferred. 2017 WL 1196978, at *18–19. But in *Cazares*, the plaintiff established that the defendant officer had evaded discipline from other acts of misconduct numerous times. *Id.* Here, by contrast, the Plaintiffs suggest only that Officer Dewitt used force in the presence of other witnesses and officers, so he must have known he could act with impunity. In addition to being speculative, this evidence again falls back on the specific facts of this incident detached from any pattern of officers acting with impunity. This is insufficient to show that the City's action directly caused the constitutional injury. *See Dean*, 18 F.4th at 240 ("Consistent with the Supreme Court's guidance, we have repeatedly rejected *Monell* claims that rest on the plaintiff's individualized experience without evidence of other constitutional violations." (collecting cases)).

The Plaintiffs cannot carry their burden of proof on their *Monell* claim on this record. The City is entitled to summary judgment.

**ii. Indemnification**

The parties agree that the Plaintiffs' indemnification claim lives and dies by the Defendant Officers' individual liability on the Illinois state-law claims. As Bedford's IIED claim against Officer Dewitt survives, so too does the contingent indemnification claim against the City of Chicago on this issue.

CONCLUSION

In sum, the Court denies in part and grants in part the Defendant Officers' Motion for Summary Judgment. [150] The Court denies Defendant Officer Dewitt summary judgment on Bedford's excessive-use-of-force claim (Count I); grants all Defendant Officers summary judgment on Jones's false-arrest and unlawful-detention claim (Count II); denies all Defendant Officers summary judgment on Jones's claim for denial of medical attention (Count III); grants all Defendant Officers summary judgment on both Plaintiffs' malicious-prosecution claims (Count VIII); denies Officer Dewitt summary judgment on Bedford's IIED claim (Count IX); grants all Defendant Officers summary judgment on the Plaintiffs' conspiracy claims (Count IV); and grants Sgt. Conneely and Cpt. Kane summary judgment on Plaintiffs' supervisory-liability claim but denies Comm. Rubio summary judgment for supervisory liability related to Officer Dewitt's use of force against Bedford (Count X).

The Court denies in part and grants in part Defendant Joseph Plewa's and Defendant 1000 Liquors, Inc.'s Motion for Summary Judgment. [142] The Court grants the BCT Defendants summary judgment on both Plaintiffs' conspiracy claims (Count IV); denies the BCT Defendants summary judgment on the negligence claims (Counts V–VI); and denies the BCT Defendants

summary judgment on the IIED claims (Count IX). Jones's assault and battery claim (Count VII) and both Plaintiffs' malicious-prosecution claims against the BCT Defendants (Count VIII) survive, as the BCT Defendants did not move for summary judgment on those counts.

The Court grants in part and denies in part Defendant City of Chicago's Motion for Summary Judgment. [153] The Court grants the City summary judgment on the Plaintiffs' *Monell* claim but denies the City summary judgment on the Plaintiffs' indemnification claim as to Bedford's IIED claim against Defendant Officer Dewitt.


_____
Virginia M. Kendall
United States District Judge

Date: March 17, 2023